Nos. 25-3030, 25-3034, 25-3293

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| American Federation of Government Employees, AFL-CIO, *et al.*,<br><br>    *Plaintiffs-Appellees*,<br><br>v.<br><br>Donald J. Trump, *in his official capacity as President of the United States*, *et al.*,<br><br>    *Defendants-Appellants*. | Nos. 25-3030, 25-3293<br><br>On Appeal from the U.S. District Court for the Northern District of California<br><br>D.C. No. 3:25-cv-03698-SI |
| *In re* Donald J. Trump, *in his official capacity as President of the United States, et al.*,<br><br>    *Petitioners-Defendants*. | No. 25-3034<br><br>On Petition for Writ of Mandamus to the U.S. District Court for the Northern District of California<br><br>D.C. No. 3:25-cv-03698-SI |

## OPPOSITION TO SUPPLEMENTAL EMERGENCY MOTION FOR STAY PENDING APPEAL / PETITION FOR WRIT OF MANDAMUS

Elena Goldstein
Skye Perryman
Tsuki Hoshijima
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090
egoldstein@democracyforward.org
sperryman@democracyforward.org

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151
sleyton@altber.com
dleonard@altber.com

*Attorneys for Plaintiffs-Appellees/Real Parties in Interest\**
*\*Additional counsel and affiliations on signature pages*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................3

    A.    Federal Agency Organization and Authority.........................................3

    B.    President Trump's Current Attempt to Transform the Government .................................................................................6

STANDARD ........................................................................................10

ARGUMENT .......................................................................................11

    I.    Defendants Are Unlikely to Prevail on Appeal .....................11

        A.    The District Court correctly found that Defendants acted unlawfully..............................................................11

            1.    The EO exceeds the President's constitutional and statutory authority...................................................11

            2.    OMB, OPM, and DOGE exceeded their authority.........19

            3.    OMB's and OPM's actions violate the APA .................20

        B.    Federal courts have subject matter jurisdiction to hear Plaintiffs' constitutional and APA claims..................................22

            1.    Local Governments, Non-Profits, and Non-Federal Unions..........................................................................24

            2.    Federal Sector Union Plaintiffs. ....................................26

        C.    The District Court correctly found Plaintiffs faced irreparable injury..................................................................28

        D.    The District Court did not err in the scope of relief ordered .....................................................................................30

    II.    Defendants Do Not Establish Irreparable Injury................................33

III.    Equitable Factors Weigh Against a Stay ............................................34

CONCLUSION ........................................................................................35

CERTIFICATE OF COMPLIANCE...........................................................42

FILER'S ATTESTATION .........................................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AFGE v. OPM,*
  2025 WL 900057 (N.D. Cal. Mar. 24, 2025) ....................................26

*AFGE v. OPM,*
  2025 WL 914823 (9th Cir. Mar. 26, 2025) .....................................24

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) ...........................................33, 34

*Alder v. TVA,*
  43 F.App'x 952 (6th Cir. 2002) ...........................................24

*Allen v. Milligan,*
  599 U.S. 1 (2023).........................................................31

*Appalachian Power Co. v. EPA,*
  208 F.3d 1015 (D.C. Cir. 2000)...........................................20

*Axon Enters., Inc. v. FTC,*
  598 U.S. 175 (2023).........................................23, 25, 26, 28

*Biden v. Texas,*
  597 U.S. 785 (2022).......................................................21

*Block v. Community Nutrition Institute,*
  467 U.S. 340 (1984).......................................................25

*Bowers v. Mich. Acad. of Fam. Physicians,*
  476 U.S. 667 (1986).......................................................25

*Bowsher v. Synar,*
  478 U.S. 714 (1986).......................................................17

*Califano v. Yamasaki,*
  442 U.S. 682 (1979).......................................................31

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) .........................................28, 30

*Carr v. Saul,*
  593 U.S. 83 (2021)............................................................................28

*Chen v. INS,*
  95 F.3d 801 (9th Cir. 1996) ............................................................18

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979)........................................................................17

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971)........................................................................14

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ................................................*passim*

*City of Arlington, Tex. v. F.C.C.,*
  569 U.S. 290 (2013)..........................................................................5

*Colorado River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976)........................................................................22

*Community Legal Services in East Palo Alto v. U.S. Department of
  Health and Human Services,*
  2025 WL 1393876 (9th Cir. May 14, 2025)....................................33

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024)........................................................................32

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019)..................................................................24, 25

*Doe #1 v. Trump,*
  957 F.3d 1050 (9th Cir. 2020) ........................................................33

*Duenas v. Garland,*
  78 F.4th 1069 (9th Cir. 2023) .........................................................13

*E. Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) ..........................................................10

*E. Bay Sanctuary Covenant v. Garland,*
  994 F.3d 962 (9th Cir. 2020) ..........................................................32

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) .................................................................34

*EEOC v. Allstate Ins. Co.*,
    570 F.Supp. 1224 (S.D. Miss. 1983) ...................................................19

*EEOC v. CBS, Inc.*,
    743 F.2d 969 (2d Cir.1984) ..................................................................19

*EEOC v. Chrysler Corp.*,
    595 F.Supp. 344 (E.D. Mich. 1984) ....................................................19

*EEOC v. Martin Indus., Inc.*,
    581 F.Supp. 1029 (N.D. Ala. 1984) ....................................................19

*EEOC v. Merrill Lynch, Pierce, Fenner & Smith*,
    677 F.Supp. 918 (N.D. Ill. 1987) ........................................................19

*EEOC v. Pan Am. World Airways*,
    576 F.Supp. 1530 (S.D.N.Y. 1984) .....................................................19

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ...........................................................................22, 25

*Env't Def. Ctr v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) ................................................................21

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) .............................................................................26

*Feds for Med. Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) (en banc) ..........................................26, 28

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ............................................................3, 13, 27, 28

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
    512 F.3d 1112 (9th Cir. 2008) .............................................................29

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)..............................................................................16

*Halverson v. Slater*,
    129 F.3d 180 (D.C. Cir. 1997).......................................................5, 14

*Harris v. Bd. of Supervisors*,
    366 F.3d 754 (9th Cir. 2004) ............................................................30

*Hilton v. Sullivan*,
    334 U.S. 323 (1948)...................................................................12, 15

*INS v. Chadha*,
    462 U.S. 919 (1983)...........................................................................19

*Keim v. United States*,
    177 U.S. 290 (1900)...........................................................................13

*Kerr v. Jewell*,
    836 F.3d 1048 (9th Cir. 2016) ..........................................................23

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162 (2016).............................................................................7

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..............................................................35

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024).....................................................15, 24, 25, 28

*Lopez v. Heckler*,
    713 F.2d 1432 (9th Cir. 1983) ..........................................................35

*Maryland v. USDA*,
    2025 WL 1073657 (4th Cir. Apr. 9, 2025).......................................34

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012)...........................................................................22

*Morrison v. Olson*,
    487 U.S. 654 (1988)...........................................................................12

*Myers v. United States*,
    272 U.S. 52 (1926).............................................................................13

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*,
595 U.S. 109 (2022)................................................................13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
422 F.3d 782 (9th Cir. 2005) ...............................................10

*Navajo Nation v. Dep't of Interior*,
819 F.3d 1084 (9th Cir. 2016) .............................................21

*New York v. Trump*,
133 F.4th 51 (1st Cir. 2025)................................15, 18, 21

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)..............................................................18

*Nken v. Holder*,
556 U.S. 418 (2009)..............................................................10

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004)................................................................22

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*,
128 F.4th 1089 (9th Cir. 2025) ...........................................21

*Regents of Univ. of Cal. v. Dep't Homeland Sec'y*,
908 F.3d 476 (9th Cir. 2018) ...............................................32

*Russell v. U.S. Dep't of the Army*,
191 F.3d 1016 (9th Cir. 1999) .............................................23

*Sackett v. EPA*,
566 U.S. 120 (2012)..............................................................25

*Saloojas, Inc. v. Aetna Health of California, Inc.*,
80 F.4th 1011 (9th Cir. 2023) .............................................25

*Saul v. United States*,
928 F.2d 829 (9th Cir. 1991) ...............................................23

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020)........................................................12, 13

*State v. Su*,
121 F.4th 1 (9th Cir. 2024) ................................................................19

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ...............................................................25, 27

*Trump v. Wilcox*,
No. 24A966, 2025 WL 1464804 (U.S. May 22, 2025) .....................................27

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
578 U.S. 590 (2016) ...........................................................................25

*United States v. Fausto*,
484 U.S. 439 (1988) ........................................................22, 24, 25

*United States v. Giordano*,
416 U.S. 505 (1974) ........................................................................5, 14

*United States v. Perkins*,
116 U.S. 483 (1886) ...........................................................................12

*Veit v. Heckler*,
746 F.2d 508 (9th Cir. 1984) ..............................................................23

*W. Virginia v. EPA*,
597 U.S. 697 (2022)........................................................................5, 9

*Washington v. Trump*,
2025 WL 553485 (9th Cir. Feb. 19, 2025) .......................................35

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
586 U.S. 9 (2018)...............................................................................25

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)...........................................................................11

**U.S. Constitution**

U.S. Const., Article I, § 1, 7......................................................................3

**Statutes**

5 U.S.C.
    § 102 ................................................................................................18
    § 105 ................................................................................................18
    § 301 ......................................................................6, 16, 17, 18
    § 705 ................................................................................................33
    § 706 ................................................................................................20
    § 901 ................................................................................................12
    §§ 901-903 ..................................................................................4
    §§ 901-912 ..................................................................................2
    § 903 ................................................................................................12
    § 905 ..................................................................................................4
    § 1101-1105 ..............................................................................21
    § 1103 ............................................................................................26
    § 1105 ............................................................................................26
    § 3101 ........................................................................6, 16, 21
    §§ 3501-3504 ............................................................................6
    § 3502 ....................................................................15, 16, 17
    § 7103 ............................................................................................23
    § 7117 ............................................................................................23
    § 7118 ............................................................................................23
    § 7123 ............................................................................................23
    § 7134 ............................................................................................26
    § 7701 ..................................................................................23, 24
    § 7703 ............................................................................................23

6 U.S.C. § 452 ......................................................................................5

7 U.S.C. § 5921 ..................................................................................9

15 U.S.C. § 8962 ..............................................................................9

28 U.S.C. § 1331 ............................................................................22

31 U.S.C. § 503 ................................................................................21

**Regulations**

5 C.F.R.
    Part 351 ..................................................................................15
    § 351.201..............................................................................21
    § 351.901..............................................................................24

**Executive Orders**

Exec. Order No. 12839, 58 Fed. Reg. 8515 (Feb. 12, 1993) ...................................16

Exec. Order No. 13781, Fed. Reg. 13959 (Mar. 16, 2017) .......................................5

Exec. Order No. 14210 (Feb. 11, 2025)......................................................*passim*

**Administrative Materials**

71 Fed. Reg. 42234 (July 25, 2006).......................................................18

75 Fed. Reg. 70122 (Nov. 17, 2010) ......................................................17

*President's Authority To Promulgate a Reorganization Plan Involving the Equal Employment Opportunity Commission*, 1 Op. O.L.C. 248 (1977) ..........................................................................3

*Limitations on Presidential Power to Create A New Exec. Branch Entity to Receive & Administer Funds Under Foreign Aid Legis.*, 9 Op. O.L.C. 76 (1985) .............................................................3

*NTEU and Dep't of Treasury, IRS,*
60 F.L.R.A. 783 (2005)......................................................23

**Other Authorities**

Cong. Rsch. Serv., R44909, *Executive Branch Reorganization* (Aug. 3, 2017) ..................................................................3, 4

Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress* (Dec. 11, 2012) .....................................................................4

Cong. Rsch. Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide" Proposals* (July 25, 2018) .....................................................................5

Gov't Accountability Office Report GAO-04-261SP, *Principles of Federal Appropriations Law: Third Ed.* (Jan. 2004).............................................3

John W. York & Rachel Greszler, *A Model for Executive Reorganization*, Heritage Foundation Legal Memorandum No. 4782, at 1-2 (Nov. 3, 2017)....................................................................3

Larkin & Seibler*, The President's Reorganization Authority*, Heritage Foundation Legal Memorandum No. 210 (July 12, 2017)............................3, 11

*A Model for Executive Reorganization*, Heritage Foundation Legal Memorandum No. 4782.........................................................................3

*The President's Reorganization Authority*, Heritage Foundation Legal Memorandum No. 210.........................................................................3

## INTRODUCTION[1]

Early in his second term, President Trump launched an unprecedented campaign to radically reorganize, and thereby dismantle, the federal government, calling this "large scale structural reform" the "Manhattan Project of our time."[2] Rather than cooperate with Congress through the legislative or budgetary process, the President issued a "Workforce Optimization" Executive Order, No. 14210 ("EO"), which unilaterally orders the dramatic restructuring and downsizing of every federal agency.  The President's orders, which include eliminating any office or function he directs and "large-scale" workforce reductions, necessarily disregard agency function or need and replace reasoned decision-making with categorical directives.

The President enlisted the Office of Management and Budget ("OMB") and Office of Personnel Management ("OPM") to direct implementation of this EO government-wide on extraordinarily truncated timelines.  In March and April, federal agencies chaotically began implementing their required Agency RIF and Reorganization Plans ("ARRPs"), to the detriment of the agencies, their

---

[1] Plaintiffs submit this identical response in Case Nos. 25-3030, 25-3034, and 25-3293, although the TRO and mandamus appeals have been mooted.  Defendants withdrew their Supreme Court application to stay the TRO (and discovery order) after the preliminary injunction decision mooted it.  *AFGE v. Trump*, No. 24A1106 (U.S.) (stay requested May 16; withdrawn May 23).  Plaintiffs also stand on their previous response in No. 25-3034, where the challenged discovery order is being reconsidered.

[2] Statement by President-elect Trump announcing Department of Government Efficiency, The American Presidency Project (Nov. 12, 2024), available at: https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-that-elon-musk-and-vivek-ramaswamy.

-1-

employees, and all those who rely on their services, including the many Plaintiff organizations, their members, and Plaintiff local governments.

As the District Court found, Congress—not the President—creates and determines the size and structure of the federal agencies. For a century, Presidents undertaking reorganization projects both between and within agencies have thus uniformly sought congressional authorization. But President Trump has obtained neither renewal of the reorganization authority (still codified at 5 U.S.C. §§901-912) that expired in 1984, nor any other congressional authorization for his actions. The EO and implementing OMB/OPM directives go far beyond any authority agencies may have to internally regulate their organization and workforce size.

Based on its conclusions that this unprecedented presidential assertion of reorganization authority and agency implementation were likely ultra vires and violate the Administrative Procedure Act ("APA"), and that federal courts have jurisdiction to hear these claims, the District Court properly enjoined implementation of the EO until the merits of this case may be resolved.

Faced with Plaintiffs' unchallenged and substantial evidence demonstrating that the President and his central agencies were dictating how and when agencies should transform themselves, causing ongoing and widespread harm, Defendants presented no evidence. The Court's injunction is no broader than necessary to maintain the status quo and prevent the unconstitutional dismantling of the government which, if permitted to resume, will be impossible to later undo.

///

///

-2-

## BACKGROUND

### A.    Federal Agency Organization and Authority

Pursuant to its constitutional authority, Congress establishes the existence,
functions, structure, and size of federal agencies via authorization and
appropriation legislation.  U.S. Const., Art. I, Sec. 1, 7; *Free Enter. Fund v. Pub.
Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010).[3]  At times, Congress has
delegated to the President specific authorization to reorganize the structure and size
of the federal agencies.  The District Court accurately recounted the history: for
100 years, every President who sought to alter the structure *of* and *between* federal
agencies has obtained congressional authorization.  Add.701-05; *see* Cong. Rsch.
Serv., R44909, *Executive Branch Reorganization*, at 6 (Aug. 3, 2017); Larkin &
Seibler*, The President's Reorganization Authority*, Heritage Foundation Legal
Memorandum No. 210, at 1-3 (July 12, 2017).[4]  Such delegations generally include

---

[3] "[T]he typical sequence is: (1) organic legislation; (2) authorization of
appropriations …; and (3) the appropriation act."  Gov't Accountability Office
Report GAO-04-261SP, *Principles of Federal Appropriations Law: Third Ed.*, at 2-
42 (Jan. 2004).

[4] *See also* John W. York & Rachel Greszler, *A Model for Executive
Reorganization*, Heritage Foundation Legal Memorandum No. 4782, at 1-2 (Nov.
3, 2017) ("[S]weeping reorganization of the federal bureaucracy requires the active
participation of Congress."), available at: https://www.heritage.org/political-
process/report/model-executive-reorganization; *Limitations on Presidential Power
to Create A New Exec. Branch Entity to Receive & Administer Funds Under
Foreign Aid Legis.*, 9 Op. O.L.C. 76, 78 (1985) (recognizing "need for
reorganization legislation in order to restructure or consolidate agencies within the
Executive Branch"); *President's Authority To Promulgate a Reorganization Plan
Involving the Equal Employment Opportunity Commission*, 1 Op. O.L.C. 248, 250
(1977) ("reorganization plan may not transgress the limitations set forth" in
reorganization legislation).

-3-

the "reorganization plan contents, the limitations on power, and the expedited parliamentary procedures."[5]  *E.g.*, 5 U.S.C. §§901-903 (still codified).

Presidents have employed such statutory authority for reorganizations ranging from "relatively minor reorganizations within individual agencies" to "the creation of large new organizations."  Cong. Rsch. Serv., *supra* n.5 at 2, 6.[6] Congress has also denied some requests for reorganization authority, as with Presidents Reagan in 1981, Bush in 2003, and Obama in 2012.[7]  And it has rejected some presidential reorganization plans, including proposals to eliminate, merge, and consolidate agencies.  *See*, *e.g.*, H.R. 714, 98th Cong. (1983); H.R. 1510, 115th Cong. (2017); S. 1116, 112th Cong. (2011); H.R. 609, 114th Cong. (2015).

The most recent Reorganization Act authority expired on December 31, 1984.  Pub. L. No. 98-614, 98 Stat. 3192; *see* 5 U.S.C. §905(b).  President Trump unsuccessfully sought renewal of this reorganization authority during his first term.

---

[5] Cong. Rsch. Serv., R42852, *Presidential Reorganization Authority: History, Recent Initiatives, and Options for Congress*, at 2 (Dec. 11, 2012); *id.* at n.11 (collecting prior authorizations) & Tbl. 1 ("Reorganization Authority, by President").

[6] Other times, Congress has consolidated functions and reorganized agencies through regular legislation.  *See*, *e.g.*, Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135.  Congress has also sometimes delegated to the President limited authority to reorganize specific agencies, typically with expiration dates for the authority.  *E.g.*, Pub. L. 105-277, div. G, subdiv. A, §§1601, 6601(e), 112 Stat. 2681-795 (1998) (USAID reorganization).

[7] *See* Cong. Rsch. Serv., *supra* n.5, at 29, 32-34; S. 2129, 112th Cong. (2012); H.R. 4409, 112th Cong. (2012).

Add.395; *see* Exec. Order No. 13781, 82 Fed. Reg. 13959 (Mar. 16, 2017);[8] H.R. 6787, 115th Cong. (2017-2018); S. 3137, 115th Cong. (2018). Congress also convened numerous hearings on President Trump's specific reorganization proposals, which were largely not enacted.[9]

To the agencies themselves, Congress has provided direction regarding their structure, function, and authority in their organic authorizing statutes, and agencies must act within those confines.[10] Agencies may not, without congressional authorization, eliminate authorized programs or transfer functions to another agency.[11] Congress has at times specifically delegated to an agency head the authority to internally reorganize, including by imposing conditions on such actions.[12] Congress has never delegated to agencies across the board plenary power to organize themselves in any manner, or to reduce the federal workforce

---

[8] *See* OMB, *Delivering Government Solutions in the 21st Century* (June 2018) at 4 (conceding "significant changes will require legislative action"), available at https://www.whitehouse.gov/wp-content/uploads/2018/06/Government-Reform-and-Reorg-Plan.pdf.

[9] Add.464-65 (listing hearings); Cong. Rsch. Serv., *Trump Administration Reform and Reorganization Plan: Discussion of 35 "Government-Wide" Proposals*, at 1 (July 25, 2018).

[10] *E.g.*, *W. Virginia v. EPA*, 597 U.S. 697, 723 (2022) (Roberts, J.) ("Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line.") (cleaned up); *accord City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013).

[11] *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997); *United States v. Giordano*, 416 U.S. 505 (1974).

[12] *E.g.*, 6 U.S.C. §452 (delegating authority and placing limitations on Department of Homeland Security reorganization).

size by eliminating authorized positions.  Rather, Congress has delegated to agencies general "house-keeping" authority to "prescribe regulations for the government of [the] department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property," 5 U.S.C. §301, and to "employ such number of employees" that "Congress may appropriate for from year to year," *id.* §3101.  Congress has also enacted retention preference statutes setting forth rules when a reduction in force ("RIF") is implemented, consistent with congressionally-authorized functions and budgets.  *Id.* §§3501-3504.[13]

**B.    President Trump's Current Attempt to Transform the Government**

On February 11, 2025, President Trump issued Executive Order No. 14210 requiring all federal agencies to "*commence*[] a critical *transformation* of the Federal bureaucracy."  Add.205 §1 (emphases added).  The accompanying "Fact Sheet" explained:  "President Donald J. Trump is committed to reducing the size

---

[13] Congress has also, at times, specifically authorized the executive branch to reduce the size of the federal workforce.  *See, e.g.*, Workforce Restructuring Act of 1994, 108 Stat. 111 (directing President to meet reduction targets for federal civilian workforce); Defense Authorization Amendments and Base Closure and Realignment Act, 102 Stat. 2623, 2627 (1988) (authorizing several rounds of closures of military installations that employed military and civilian personnel), as amended by 104 Stat. 1485, 1808-14 (1990), and by 108 Stat. 2626 (1994), and by 115 Stat. 1342 (2004); Federal Employees' Pay Act of 1945, Pub. L. 79-106, §607(b), 59 Stat. 295 (granting budget director authority to set agency personnel ceilings and order staffing reductions), repealed 64 Stat. 843 (1950).  Congress has not granted such authority to President Trump.

and scope of the federal government," and "[t]he Order will significantly reduce the size of government."[14]  Add.435.

To serve this "transformation" purpose, the EO requires that all federal agencies "*shall*" "promptly undertake preparations to initiate *large-scale reductions-in-force (RIFs)*" and "submit" a "reorganization plan" for what remains of the agency (within 30 days). Add.205-06 §§1, 3(c), (e) (emphases added).[15]

The EO imposes specific, mandatory parameters for the content of those RIF and reorganization plans, including that RIFs "*shall*" "prioritize[]" "[a]ll offices that perform functions not mandated by statute or other law," "all agency initiatives, components, or operations that *my Administration suspends or closes*" and "all components and employees performing functions" not required for government shutdown-level staffing. *Id.* §3(c) (emphases added); *see* Add.710. As to reorganization, the EO similarly orders agencies to identify for OMB any "statutorily required entities," and address "whether the agency or any of its subcomponents should be eliminated or consolidated." Add.206 §3(e).  The EO permits (using "may") agency heads to exempt certain security positions. *Id.* §4(b), (c).

---

[14] White House, *Fact Sheet: President Donald J. Trump Works to Remake America's Federal Workforce* (Feb. 11, 2025), available at: https://www.whitehouse.gov/fact-sheets/2025/02/fact-sheet-president-donald-j-trump-works-to-remake-americas-federal-workforce/.

[15] "It is generally clear that 'shall' imposes a mandatory duty." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016).

On February 26, OMB/OPM issued a Memorandum implementing the EO, which confirmed that the President "directed" and "required" agencies to commence RIFs and reorganizations. Add.209. OMB and OPM "instruct[ed]" each federal agency to "submit[]" a combined ARRP implementing the EO for OMB/OPM's "review and approval." Add.209, 211-12. The Memorandum explained: "Pursuant to the President's direction, agencies should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions." Add.210.[16]

The Memorandum thus makes clear that RIFs are the reorganization's *centerpiece*, requiring the submission *within two weeks* (by March 13) of "Phase 1 ARRPs," which "*shall focus on initial agency cuts and reductions.*" Add.211 (emphasis added).[17] Agencies were then required to submit Phase 2 ARRPs within another month (by April 14), that reorganize agencies around what remains after

---

[16] OMB/OPM also required agencies to work with DOGE in designing the RIFs, to "include positions not typically designated as essential during a lapse in appropriations" and to "refer to the functions that are excepted from the [2019 lapse plans] as the starting point for making this determination." Add.210. OMB/OPM also prohibited "agencies or components that provide direct services to citizens" from implementing "any proposed ARRPs" until OMB/OPM make particular certifications. Add.214.

[17] The Memorandum includes a "Sample RIF Timeline" requiring agencies to submit areas to RIF, "[d]raft RIF notices" within 30 days, and "[i]ssue official RIF notices" within 60 days (shortened to 30 with an OPM waiver). Add.215. Plaintiffs submitted former agency official declarations explaining the impossibility of preparing plans that properly account for agency requirements in such a condensed time frame. Add.186; ECF 37-60 to 62. "ECF" refers to the District Court docket.

these RIFs.  Add.212-13.  Defendants did not dispute Plaintiffs' showing that OMB and OPM have *rejected* certain agencies' ARRPs for failure to eliminate enough positions, Add.159, 569, 708-09, or that agencies commenced implementation soon after these submission deadlines.  Add.674 n.1, 680-81.[18]

Plaintiffs assembled a substantial and unrebutted record of actions implementing the EO through RIFs and reorganizations, including, as the District Court found, substantial cuts to statutorily mandated programs.  Add.674 n.1, 712; *see* Add.674 n.1, 680-81; Add.151-52 (HHS: "transformation," per EO, by cutting 10,000 positions, with more to come, at CDC, FDA and NIH, and eliminating entire programs like CDC office that monitors lead exposure in children); Add.152 (SBA: "will reduce its workforce by 43%");  Add.152 (VA: implementing EO by cutting *80,000 jobs* serving veterans).[19]  Agencies across the government are eliminating functions (Add.674 n.1, 680-81);[20] the President is asserting that his

---

[18] Notwithstanding ongoing implementation, the Administration has refused to disclose ARRPs to employees, their unions, the public, or Congress, Add.679, and is resisting revealing them to the federal courts, *see* 9th Cir. Case No. 25-3034.

[19] *See* Add.161 (*AmeriCorps*: nearly all staff RIF'd per EO); ECF 70-1 Exs. C-D (*EPA*: scientific research office cut per EO); ECF 37-14 at ¶¶9-12, Exs. A-D (*GSA*: RIFs and offices cut "[i]n support of the [EO]"); ECF 41-1 at ¶15, Ex. C (*HUD*: large-scale RIFs in "[c]ompliance with [EO]"); ECF 70-2 Exs. A-C (*Labor*: eliminating entire office per President order and RIF to all staff); Add.171 (*NSF*: cutting half of staff under "orders from the White House"); Add.172-73 (*SSA*: plans per EO include "abolishment of organizations and positions" and RIFs); Add.173-74 (*State*: consolidation, 15% reduction per EO); Add.174 (*Treasury*: 40% IRS cut per EO).

[20] *E.g.*, Add.151-52 (HHS); Add.161 (AmeriCorps); ECF 70-1 ¶¶6-7 (EPA Office of Research and Development, *see* 7 U.S.C. §5921(f); 15 U.S.C. §8962).

Executive Orders abolishing offices "eliminate[]" their "statutory and regulatory foundation";[21] and the reorganization is transferring functions and offices *between* agencies.[22]

The District Court rejected Defendants' suggestion that the EO and Memorandum be construed as "merely providing guidance about how agencies should conduct RIFs," finding that the record evidence "tells a very different story: that the agencies are acting at the *direction* of the President and his team." Add.708.

As detailed *infra*, these actions have caused substantial injury to Plaintiffs, their members, and the public.

## STANDARD

A stay pending appeal is an "extraordinary request." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 (9th Cir. 2021). Irreparable injury and likely success on appeal "are the most critical" factors. *Nken v. Holder*, 556 U.S. 418, 433 (2009). The Court also considers whether a stay will injure other parties and the public interest. *Id.* at 434. The applicant bears the burden of proof, and any factual findings are subject to "very deferential" clear-error review. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 794 (9th Cir. 2005).

---

[21] Add.710 (citing ECF 70-2 ¶¶4, 7, Exs. C, D).

[22] *E.g.*, ECF 70-1 ¶¶3-4 & Ex. A (Agriculture plans include consolidating functions with seven other agencies); ECF 37-26 ¶¶42-43 (Education student aid office will move to SBA).

-10-

# ARGUMENT

## I.    Defendants Are Unlikely to Prevail on Appeal

### A.    The District Court correctly found that Defendants acted unlawfully

#### 1.    The EO exceeds the President's constitutional and statutory authority

The Constitution is predicated on the idea that Executive power is not unlimited:  "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  Where, as here, Congress neither reauthorized reorganization authority nor otherwise delegated authority to the President to alter federal agency structure, organization, or staffing levels, his power is "at its lowest ebb."  *Id.* at 637 (Jackson, J., concurring); *accord City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018); Add.701.

There is no real dispute that the President lacks authority to reorganize the federal government without congressional authorization.  *E.g.*, Larkin & Seibler, *supra*, at 3 ("[T]he President does not have constitutional authority to reorganize the executive branch on his own.").  Nor can there be any real dispute that this EO directs reorganization of the federal government—imposing a radical "transformation" of *all* federal agencies by eliminating programs and functions, transferring functions between agencies, and ordering agencies to restructure themselves through large-scale RIFs.  *Supra* at 7-10; Add.118.  While Defendants portray this case as solely about agencies' authority to conduct RIFs, the EO and

-11-

Memorandum require *every* federal agency to reorganize in a manner reflecting a dramatically reduced workforce through combined RIF/reorganization plans, and Defendants made no attempt to refute Plaintiffs' evidence bearing this out. *Supra* at 7-10. The actions the EO and Memorandum require fall squarely within 5 U.S.C. §903—the reorganization authority that expired in 1984—which defined "reorganization" to include changes between *and* within agencies, and consolidation or elimination of statutory *and* non-statutory functions. *Supra* at 3-4; Add.702.[23]

Even if this case were only about RIFs, the President's Article II power does not extend to terminating rank-and-file civil service employees, let alone ordering mass terminations government-wide. *E.g.*, *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 218 (2020); *Morrison v. Olson*, 487 U.S. 654, 673-75 (1988); *United States v. Perkins*, 116 U.S. 483, 485 (1886); *see Hilton v. Sullivan*, 334 U.S. 323, 332 (1948) ("seniority rights" during RIF "depend entirely upon congressional acts" and implementing regulations).[24]

---

[23] 5 U.S.C. §§901, 903(a). Under the now-expired reorganization authority, Congress required the President to explain in detail how any proposed changes would comport with the agencies' statutory requirements and funding levels. *Id.* §903(b). Under Defendants' theory, the President requires no congressional authorization to order agencies to terminate all agency functions "not mandated by statute," Mot. 12-16, which would make the 1984 reorganization authority superfluous. *See* Add.675, 701-06.

[24] Indeed, the government recently told the Supreme Court that the President would be harmed by the inability to remove agency heads, because "*[a]gency heads*" (not the President) "*control hiring and firing decisions for subordinates.*" *Bessent v. Dellinger*, No. 24A79 (U.S.) (Feb. 16, 2025 Application to Vacate and

-12-

Directing the structure and size of federal agencies is a legislative, not executive, function:  "To Congress under its legislative power is given the establishment of offices ... [and] the determination of their functions and jurisdiction."  *Myers v. United States*, 272 U.S. 52, 129 (1926); *see Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA*, 595 U.S. 109, 117 (2022) (federal agencies are "creatures of statute"); *Free Enter. Fund,* 561 U.S. at 500 ("Congress has plenary control over the salary, duties, and even existence of executive offices.").  Defendants therefore rely solely on the President's general authority, pursuant to his Article II duty to take care that Congress's laws are faithfully executed, to supervise federal agencies' exercise of their *own* congressionally delegated authority.  Mot. 14.[25]  Defendants thus apparently concede that the President's authority extends no further than that of the agencies themselves.  Mot. 12-16.  But Defendants' argument that the EO and OMB/OPM Memorandum fall within agencies' existing statutory authority fails for at least the following reasons.

a.  Without congressional authorization, agencies cannot transfer functions to *other* agencies, including to OMB, OPM, or DOGE.  *Supra* at 3-6; *United States v.*

---

Request for Administrative Stay), at \*27 (emphases added)).  *Keim v. United States*, 177 U.S. 290, 295 (1900) (cited Mot. 3), is not to the contrary, and merely stands for the proposition that *agencies* have general authority, constrained by Congress, to make employment decisions.

[25] *Duenas v. Garland*, 78 F.4th 1069, 1072 (9th Cir. 2023), which Defendants cite for this supervisory power, Mot. 12, involved the President's Appointments Clause power to remove appointed officials.  So did *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), on which *Duenas* relies.  Neither can be stretched so far as to authorize the presidential directives at issue.

*Giordano*, 416 U.S. 505 (1974); *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997).  Yet the record is uncontroverted that functions and programs are being transferred between agencies (Add.294 n.3; Add.571; *see* Add.159-176), *and* that the President has transferred agencies' authority to OMB/OPM/DOGE, which have overridden numerous agencies' decisions (Add.657 & n.2 (OMB/OPM/DOGE rejected NLRB, AmeriCorps, NSF, and non-defendant agency ARRPs for insufficient cuts); Add.708-09).  Defendants defend this transfer of agency authority based on the President's authority to supervise agencies and to delegate his own authority.  Mot. 16-18.  But the President cannot thereby circumvent the prohibition on transferring authority between agencies without congressional authorization.  *Cf. San Francisco*, 897 F.3d at 1240 (rejecting "Administration's interpretation [that] simply lead[s] us into an intellectual cul-de-sac").

b.  The President cannot lawfully order agencies to exceed, defy, or abuse their own statutory authority.  *See*, *e.g.*, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411 (1971) (discretion in implementing program does not include freedom to ignore applicable standards or reasoned decision-making).  Yet, the EO and Memorandum reflect categorical decisions and impose these parameters on the agencies, requiring them to cut all programs/offices ordered by the President and anything not "required" by statute.  Add.711-12 ("agencies have interpreted the directives from the President and OMB, OPM, and DOGE to require these cuts").  These parameters prevent reasoned decision-making, and necessarily require agencies to disregard their own governing authorities (including the APA) by imposing categorical requirements to cut programs and functions regardless of

-14-

whether they are statutorily authorized or funded by Congress, for the sole purpose of workforce reduction.[26]  The EO imposes the requirement and instructs agencies to figure out how to implement it.  That is backwards and unlawful.  *E.g. New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("funding freezes [required by Executive Order] were categorical in nature, rather than being based on individualized assessments of their statutory authorities and relevant grant terms").

c.  Defendants also misconstrue agencies' statutory authority to conduct RIFs.  They contend this authority derives from 5 U.S.C. §3502, Mot. 12-15, but section 3502 merely requires agencies to use a particular order of retention when conducting RIFs, and does not purport to provide the underlying RIF authority or define the scope of that authority.  5 U.S.C. §3502; 5 C.F.R. Pt. 351.[27]  The same is true of the historical statutes and case law Defendants cite.  *E.g.*, Ch. 287, §3, 19 Stat. 143, 169 (Aug. 15, 1876); *see* Veterans' Preference Act of 1944, Pub. L. No. 78-359, §12, 58 Stat. 390 (predecessor of modern 5 U.S.C. §3502); *Hilton*, 334 U.S. at 338 (addressing veteran preference).  When Congress has authorized the executive branch to significantly reduce the federal workforce, it has done so through specific legislation.  *Supra* at 4 n.5.

---

[26] The programs, functions, and positions that the EO and Memorandum require be eliminated have all been appropriated by Congress for this budget year.

[27] OPM's implementing regulations cannot grant greater RIF authority than the statute.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024). Section 3502 assigns a single specific task to the President: shortening the length of the notice period upon written request by agency head.  5 U.S.C. §3502(e). When Congress wanted to delegate Section 3502 authority to the President, it did so explicitly.

Agencies' authority to conduct internal RIFs is *far* better understood as derived from—and thus limited by—their general discretion to establish positions to carry out their congressionally assigned and appropriated functions, consistent with the general "housekeeping" and "authority to employ" statutes. *E.g.*, 5 U.S.C. §§301, 3101. Thus, prior administrations have addressed large-scale workforce reduction not pursuant to this "housekeeping" authority, but rather as part of the budget dialogue with Congress—not unilaterally ordered government-wide RIFs, as Defendants inaccurately assert. Mot. 2-3. The cited 1993 action, *id.* at 3, directed reduction through attrition and buyouts, not RIFs,[28] and President Clinton obtained congressional authorization for the plans. Federal Workforce Restructuring Act of 1994, Pub. L. 103-226, 108 Stat. 111 (1994).

Section 3502 cannot reasonably be read to implicitly give agencies (or the President) authority to do what the EO requires: eliminate programs and functions without any real consideration of need or purpose. *See Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (Congress does not "hide elephants in mouseholes") (cleaned up). The District Court therefore correctly recognized limitations on agencies' authority to conduct RIFs that threaten proper agency functions (which include not only "required" or "mandated" functions but also authorized or discretionary

---

[28] Exec. Order No. 12839, §1, 58 Fed. Reg. 8515 (Feb. 12, 1993) (to achieve personnel targets, positions "shall be vacated through attrition or early out programs established at the discretion of the department and agency heads"); House Rep. 103-386, 1994 U.S.C.C.A.N. 49, 52 (Nov. 19, 1993) (OMB "bulletin specified that neither it nor the Executive Order [No. 12839] … required agencies to undergo reductions-in-force.").

-16-

functions).  Add.674 & n.1, 705 n.18, 712-13.  The Government also overreads 5 U.S.C. §3502(d)(3), which does not purport to define the scope of underlying RIF authority.  Mot. 14-15.  Regardless of whether an agency could, after considering its appropriations and statutory requirements and authorizations, determine that a "large-scale" RIF is appropriate, that does not insulate *this* EO and Memorandum, which make that decision across-the-board *without* considering agency-specific factors.

d.  Defendants also overread the general agency "housekeeping" statute, 5 U.S.C. §301, which does not grant agencies unfettered discretion over agency structure or organization unless *prohibited* by Congress.  Mot. 13-14.  Rather, Section 301 "authoriz[es] what the APA terms 'rules of agency organization procedure or practice' as opposed to 'substantive rules.'"  *Chrysler Corp. v. Brown*, 441 U.S. 281, 310 (1979).  Defendants misread *Bowsher v. Synar,* 478 U.S. 714 (1986), to suggest that "filling in [the] details" means whatever the agency wants (Mot. 14), but *Bowsher* plainly instructs that "[i]nterpreting a law enacted by Congress *to implement the legislative mandate* is the very essence of 'execution' of the law."  478 U.S. at 733 (emphasis added).

Defendants cite two examples of published internal agency reorganizations (in stark contrast with the lack of such procedures under this EO).  Mot. 14.  The first is a rulemaking authorized by a specific statutory delegation to the Attorney General (75 Fed. Reg. 70122 (Nov. 17, 2010)).  The second (which is miscited, but appears to be 71 Fed. Reg. 42234 (July 25, 2006)), redefined the responsibility of the Assistant Secretary of Policy at the Labor Department, citing a *host* of statutory

-17-

authority, for the purposes of *enhancing* the Department's compliance programs: "[T]o avert and deter violations of wage, safety, employee benefits, and other laws …, the Department must offer strong, effective compliance assistance programs." *Id.* In implementing this EO, by contrast, Defendants are effectively eliminating the *entire* Office of Federal Contract Compliance Programs, ECF 70-2 ¶¶4-9— plainly not what "housekeeping" means.

Defendants also err in relying on *Nixon v. Fitzgerald*, which did not interpret Section 301 but involved only provisions under Title 10, governing military departments. The President's (greater) constitutional authority over military departments is not at issue here. 457 U.S. 731, 757 (1982) (citing former 10 U.S.C. § 8012(b), now 10 U.S.C. §9013(g)); *see* 5 U.S.C. §102 (defining military departments); *id.* §105 (defining agencies to exclude military departments).

e. Finally, the District Court correctly rejected Defendants' reliance on savings clause language. Add.711-13. As explained above, the EO asserts authority the President lacks and directs agencies to act unlawfully. *San Francisco*, 897 F.3d at 1231, 1239-40; *New York*, 133 F.4th at 69-70; Add.708-11. Defendants mischaracterize *San Francisco* (Mot. 13-14), which held that a general savings clause "does not and cannot override [the] meaning" of an Executive Order's more specific provisions. 897 F.3d at 1240.

The District Court therefore correctly held Plaintiffs likely to establish that the EO is unconstitutional and ultra vires. Add.699-706; *see State v. Su*, 121 F.4th 1, 13 (9th Cir. 2024); *San Francisco*, 897 F.3d at 1235; *Chen v. INS*, 95 F.3d 801, 805 (9th Cir. 1996) (all addressing executive orders). This conclusion does not

upend the Constitution but, as the District Court held, reestablishes the proper balance of authority between Congress and the executive branch. Add.701-04.

The precise scope of and limits on the President's *proper* exercise of Article II authority to direct agencies within their statutory duties is a question for another day. As the District Court noted, "in certain cases "[w]e have no need to fix a line …. It is enough for today that wherever that line may be, this [action] is surely beyond it." Add.722 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012)).[29]

### 2.    OMB, OPM, and DOGE exceeded their authority

The District Court found that OMB and OPM assumed for themselves agencies' decision-making authority over reorganization and RIF plans, exceeding their statutory authority, and that DOGE has *no* statutory authority, including to direct agency actions. Add.706-08.

Defendants now reargue the facts to claim OMB/OPM merely provided "interagency dialogue" and "guidance." Mot. 6, 17-18. But Defendants' argument

---

[29] Implementation of this EO, which exceeds the President's constitutional authority, to reorganize the federal government presents a serious risk of disruptive consequences, as history reveals. The last large-scale reorganization suffered from a different constitutional problem (the procedures authorized included a legislative veto, later invalidated in *INS v. Chadha*, 462 U.S. 919 (1983)). The constitutional problem caused federal courts to be inundated with "numerous challenges" to agency enforcement actions. *E.g.*, *EEOC v. Merrill Lynch, Pierce, Fenner & Smith*, 677 F.Supp. 918, 920 (N.D. Ill. 1987); *EEOC v. CBS, Inc*., 743 F.2d 969 (2d Cir.1984); *EEOC v. Chrysler Corp*., 595 F.Supp. 344 (E.D. Mich. 1984); *EEOC v. Martin Indus., Inc*., 581 F.Supp. 1029 (N.D. Ala. 1984); *EEOC v. Pan Am. World Airways*, 576 F.Supp. 1530 (S.D.N.Y. 1984); *EEOC v. Allstate Ins. Co.*, 570 F.Supp. 1224 (S.D. Miss. 1983).

is unsupported by any evidence and disregards the mandatory language of the EO and Memorandum. Add.708-11; *supra* at 7-8. Further, Plaintiffs' uncontroverted evidence showed that OMB/OPM were *in fact* exercising authority to approve or reject agencies' plans, including based on OMB/OPM's view of whether they proposed sufficient cuts (Add.708-09; *supra* at 8-10), and the immediate implementation of ARRPs following OMB/OPM's deadlines for "approval." Add.569-71, 679-81, 708; *supra* at 8-10. Meanwhile, Defendants stated they "d[id] not make or rely on any factual representations" and that "no factual development is necessary." App.629. The District Court's findings that the Memorandum gives mandatory directives, not guidance, and requires OMB/OPM approval of agency plans, were not error.

### 3. OMB's and OPM's actions violate the APA

Because OMB and OPM acted without statutory authority, their actions also exceed statutory authority under the APA. Add.716; 5 U.S.C. §706(2)(A), (C).

The District Court correctly held that OMB/OPM's Memorandum and approvals of ARRPs are all final agency action. Add.714-15. Defendants do not dispute that with respect to ARRP approvals. Mot. 11. Their characterization of the Memorandum as mere precatory "guidance," Mot. 18, is at odds with the Memorandum's plain, mandatory terms and the record evidence of its implementation. *Supra* at 7-10; *see Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) (self-styled agency "guidance" was final action because "it requires, it orders, it dictates" actions). The Memorandum's determination that OMB and OPM are the final decision-makers over agency

-20-

ARRPs is inconsistent with Congress's delegation of authority to agencies (5 U.S.C. §3101), OMB and OPM's statutory authority (5 U.S.C. §1101-1105; 31 U.S.C. §503), and OPM regulations, under which *agencies* are the decision-makers (5 C.F.R. §351.201). The Memorandum plainly alters the legal regime and "mark[s] the consummation of [OMB's and OPM's] decisionmaking process" on that question. *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1108 (9th Cir. 2025) (quotation omitted).

Defendants wrongly contend that the Memorandum itself must "directly affect" Plaintiffs. Mot. 11. "[A] federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action [on plaintiffs] rests on some other occurrence—for instance, … a decision by another administrative agency[.]" *Prutehi Litekyan*, 128 F.4th at 1110; *see Env't Def. Ctr v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 869 (9th Cir. 2022). Final agency actions include those that bind or direct how government officials act in subsequent proceedings that impact plaintiffs. *See New York*, 133 F.4th at 68; *Biden v. Texas*, 597 U.S. 785, 807-10 (2022); *Navajo Nation v. Dep't of Interior*, 819 F.3d 1084, 1091 (9th Cir. 2016). It is uncontroverted that the RIFs, reorganizations, and ARRPs do so. *Infra* at 28-30.

Because Plaintiffs challenge specific and "circumscribed, discrete agency actions" by OMB and OPM (the Memorandum and ARRP approvals), their claims are not an impermissible "programmatic attack." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004).

Defendants' cursory argument that notice-and-comment rulemaking was not required because the Memorandum merely provides nonbinding "guidance," Mot. 18, is wrong for reasons previously discussed. The Memorandum plainly contains rules that must go through APA notice-and-comment rulemaking. Add.188-90.

## B. Federal courts have subject matter jurisdiction to hear Plaintiffs' constitutional and APA claims

The District Court correctly held that Congress has not implicitly removed subject matter jurisdiction over Plaintiffs' claims. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) ("[J]urisdiction conferred by 28 U.S.C. §1331 should hold firm against 'mere implication flowing from subsequent legislation.'"); *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (describing "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them").

First, neither the Supreme Court nor this Court has endorsed Defendants' sweeping argument that, because Congress created administrative agencies to handle *some* employee claims involving their federal employment, *all* claims impacting federal employees are excluded from federal court.[30] To the contrary,

---

[30] Defendants' Supreme Court cases address employees' claims against their employing agencies, and do not purport to blanket the field of federal employment. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) (holding CSRA sent "covered employees appealing covered agency actions" to administrative adjudication); *United States v. Fausto*, 484 U.S. 439, 447-49 (1988) (same). While this Court has channeled individual employees suing employing agencies, it has never channeled claims by non-federal-employees or their unions; challenging a government-wide Executive Order or any other presidential directive or OMB or OPM action; or against any defendant besides the employing agency. *See Veit v.*

the Supreme Court recently cautioned, "a statutory review scheme [that precludes district court jurisdiction] does not necessarily extend to every claim concerning agency action."  *Axon Enters., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Kerr v. Jewell*, 836 F.3d 1048, 1052-53 (9th Cir. 2016).

Plaintiffs do not seek to "evade" any applicable procedure, Mot. 9, but bring different claims than those the statutory schemes are designed to address. Defendants invoke the agency adjudication provisions of the Civil Service Reform Act ("CSRA") and Federal Labor-Management Relations Statute ("FSLMRS"), but Plaintiffs' constitutional and APA claims against the President, OMB, OPM, or DOGE, and involving a government-wide Executive Order and Memorandum, do not fall within those administrative schemes.  Mot. 8-11.[31]  Far more textual indication of congressional intent is needed before removing the "command" of

///

///

---

*Heckler*, 746 F.2d 508 (9th Cir. 1984); *Saul v. United States*, 928 F.2d 829 (9th Cir. 1991) (individual employee); *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016 (9th Cir. 1999) (same).

[31] *See* 5 U.S.C. §7701 (MSPB appeals limited to "employee" or "applicant" claims challenging agency actions), §7703 (appeal rights similarly limited), §7103(a)(1) (FLRA: grievances by individual, labor organization, against agency); §7118 (FLRA: unfair labor practice by labor organization or agency), §7123 (FLRA: appeal rights similarly limited).  The FLRA expressly *cannot* hear disputes arising from "government-wide" action.  *E.g.*, *NTEU and Dep't of Treasury, IRS*, 60 F.L.R.A. 783, 783 (2005); 5 U.S.C. §7117(a)(1).  The grievance definition Defendants cite (Mot. 9) does not permit claims challenging the EO or Memorandum.

-23-

APA review. *Dep't of Commerce v. New York*, 588 U.S. 752, 771-72 (2019); *cf.*
*Loper Bright*, 603 U.S. at 392-93 ("The text of the APA means what it says.").[32]

     1.    *Local Governments, Non-Profits, and Non-Federal Unions.*
Defendants concede, as they must, that the Merit Systems Protection Board
("MSPB") and Federal Labor Relations Authority ("FLRA") could never hear
these Plaintiffs' claims (which include labor unions SEIU and AFSCME as
representatives of their non-federal members). Mot. 8-10. No governing authority
supports the argument that Congress intended to send such plaintiffs to agencies
that cannot hear these claims, or to foreclose these Plaintiffs altogether. *See AFGE
v. OPM*, 2025 WL 914823, at *1 (9th Cir. Mar. 26, 2025) ("Nor have appellants
demonstrated—under existing authority—that they are likely to establish that
Congress has channeled the organizational plaintiffs' claims to administrative
agencies."). Contrary to Defendants' representation (Mot. 10), *Fausto* does not
foreclose third-party claims or claims involving government-wide action simply
because they impact federal employment. 484 U.S. at 445. *Fausto* addressed the
question whether Congress intended the "withholding of remedy" to particular
employees identified expressly in the CSRA to foreclose additional relief using the

---

[32] Defendants' authorities do not preclude the type of claim in this case: 5
U.S.C. §7701 defines the appeal procedure; 5 C.F.R. §351.901 says employees
"may" appeal to MSPB; and *Alder v. TVA*, 43 F.App'x 952, 956 (6th Cir. 2002)
involved employees who "reframe[ed]" wrongful termination claims previously
asserted at the MSPB against their employing agencies seeking the same remedies.
*Id.*

Back Pay Act service, *id*.; nothing in *Fausto* suggests Congress intended to foreclose claims by any plaintiff *not* expressly identified in the statute.[33]

Implied doctrines cannot be so divorced from statutory text (which sets forth procedures Defendants admit these Plaintiffs "cannot invoke," Mot. 10). *E.g.*, *Loper Bright Enters.*, 603 U.S. at 391-92; *Saloojas, Inc. v. Aetna Health of California, Inc.*, 80 F.4th 1011, 1015 (9th Cir. 2023) (courts "presume that Congress expressed its intent through the statutory language it chose").[34] That would contravene APA precedent requiring that exceptions to judicial review be read narrowly. *Dep't of Commerce*, 588 U.S. at 771-72; *see U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 601-02 (2016); *Weyerhaeuser Co. v. U.S.*

---

[33] *Block v. Community Nutrition Institute*, which precluded consumers from challenging regulatory milk pricing market orders, is likewise inapposite. Mot. 9. That regulatory regime allowed only milk handlers and producers to participate in the regulatory and adjudicatory process; prohibited injunctions; and allowed consumers to participate by notice-and-comment. 467 U.S. 340, 348 (1984). The Court concluded that permitting consumers to sue would "nullify" the procedures established. *Id.* As the Supreme Court more recently explained: "'[T]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and indeterminate evidence of legislative intent.'" *Bowers v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 674 (1986); *accord Sackett v. EPA*, 566 U.S. 120, 129 (2012).

[34] *See also Axon Enters.*, 598 U.S. at 217 (Gorsuch, J., concurring) (addressing concerns with extending implied doctrine: "[r]espectfully, this Court should be done with the *Thunder Basin* project. I hope it will be soon."); *Elgin*, 567 U.S. at 24-25 (Alito, J., dissenting) ("When Congress creates an administrative process to handle certain types of claims, it impliedly removes *those claims* from the ordinary jurisdiction of the federal courts" but "petitioners' constitutional claims are a far cry from the type of claim that Congress intended to channel through the Board." (emphasis added)).

*Fish & Wildlife Serv*., 586 U.S. 9, 22-23 (2018).  The Congress that enacted the CSRA and FSLMRS referenced the APA at least three times (5 U.S.C. §§1103, 1105, 7134) and cannot be said to have silently foreclosed the bedrock principle of APA review.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." (citation omitted)).

The District Court correctly declined to expand implied preclusion doctrine to these claims.

2.    *Federal Sector Union Plaintiffs.*  Nor did the court err in concluding that the *same* claims brought by federal union Plaintiffs (including AFGE, and SEIU and AFSCME as representatives of their federal members) are not channeled.  Add.694-98.  While employees or their unions can bring *certain* claims before these agencies, they cannot bring *these* claims involving constitutional separation-of-powers issues and APA challenges to the government-wide EO and Memorandum, for reasons previously explained, including because those claims are *not* against an employer agency.  Add.695-98; *see also Feds for Med. Freedom v. Biden*, 63 F.4th 366, 375 (5th Cir. 2023) (en banc), *judgment vac'd as moot*, 144 S.Ct. 480 (2023) (holding that challenge by employee organizations, including union, to government-wide federal employee vaccination mandate was not channeled to MSPB or FLRA); *AFGE v. OPM*, 2025 WL 900057 (N.D. Cal. Mar. 24, 2025).  Congress did not intend for these claims to be adjudicated by agencies that cannot hear them.  *E.g.*, *Axon*, 598 U.S. at 195 ("agency adjudications are

-26-

generally ill suited to address structural constitutional challenges"); *Free Enterprise Fund*, 561 U.S. at 490.

Federal-sector union Plaintiffs can no more sue the President, OMB, OPM, or DOGE at the MSPB or FLRA than can the Plaintiffs discussed above. Nor is there any stronger textual basis to conclude that these Plaintiffs' APA claims were removed from the "command" of judicial review. Defendants' argument that the federal-sector union Plaintiffs' claims should be channeled to an agency that cannot hear them simply because they represent federal employees is not what Congress intended.

Defendants try to shoehorn Plaintiffs' claims into this doctrine by mischaracterizing them as challenging only specific RIFs by employing agencies. Mot. 8-9. But the shoe does not fit. The EO, Memorandum, and ARRPs are not covered employment actions, so the MSPB cannot hear challenges to them. And the FLRA cannot hear any claim challenging a "government-wide rule"—like in this case. *Supra*, 23 n.31. Even under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-13 (1994), claims cannot be channeled when that would prevent meaningful judicial review. Moreover, as the District Court concluded, there also can be no meaningful review when, after a prolonged administrative process, employees "would return to an empty agency with no infrastructure to support a resumption of their work." Add.696 (citation omitted). And even if these agencies could hear claims against the President, the Supreme Court's decision in *Trump v. Wilcox*, No. 24A966, 2025 WL 1464804 (U.S. May 22, 2025), holding the President likely to prevail on his constitutional challenge to for-cause removal

-27-

restrictions on members of independent agencies including the MSPB (which would apply to the FLRA), renders meaningless the review of claims *against the President* who has the power to fire the adjudicator.

Further, Plaintiffs' APA and "separation-of-powers claim[s]" are based on the President's and his implementing agencies' lack of authority, arbitrary and capricious actions, and failure to comply with required procedures—issues that are "wholly collateral" to the statute's review provisions. *Axon*, 598 U.S. at 191; *see also Feds for Med. Freedom*, 63 F.4th at 369. And the constitutional and administrative law issues that Plaintiffs raise fall far outside the MSPB and FLRA's labor-and-employment expertise. *Loper Bright*, 603 U.S. at 399; *Axon*, 598 U.S. at 190-96; *Free Enterprise Fund*, 561 U.S. at 490; *Carr v. Saul*, 593 U.S. 83, 92 (2021).

## C. The District Court correctly found Plaintiffs faced irreparable injury

The District Court found that Defendants' actions have caused, and will continue causing, irreparable injury. Add.685-89, 717. More than 70 uncontroverted declarations showed widespread and devastating impacts to Plaintiffs and their members, including extensive losses and deterioration of services. Add.159-76, 191-93, 303-05, 381-83, 572-75, 609-14.

Defendants focus only on injuries to federal employees, and argue they may later be remedied through back pay. Mot. 19-20. But damages from those injuries cannot be recovered under the APA. Add.717 (citing *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018)). Moreover, "given the scale and speed of defendants'

-28-

actions, if the reorganization continues, the agencies will not easily return to their prior level of operations." Add.717. Back pay also could not remedy loss of "timely access to health care" benefits or the need to relocate. *Id.* (quoting *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1125 (9th Cir. 2008)).

Defendants completely overlook the numerous "non-federal employee members" of Plaintiff unions, "who stand to lose their jobs as a result of federal workforce reductions" and could never obtain back pay. Add.685-86. Defendants also ignore the District Court's finding that local government plaintiffs face irreparable injuries for which they cannot recover damages. The District Court identified and "highlight[ed]" several "examples from the evidence" that demonstrate such injuries, including closure of Head Start programs, inability of farmers to obtain assistance, extended wait times and website problems for Social Security beneficiaries, and delayed processing and communication about grants for public health and capital projects. Add.674 n.1, 685-86, 688-89, 717.

Substantial record evidence supports those findings and establishes that essential federal government services, relied on by non-profit and local government plaintiffs as well as union Plaintiffs' non-federal-employee members, have and will continue to suffer. *See*, *e.g.*, ECF 37-39 ¶¶7-8, 11 (extreme Social Security delays will threaten benefits access if already understaffed agency cuts 7,000 employees as planned); ECF 37-37 ¶¶18-21, 40-41 (cuts to county-based offices and staff at Agriculture threaten survival of small and medium farms); ECF 37-44 ¶¶19-22 (harms to veterans' health care); ECF 37-38 ¶¶15-16 (same).

Counties have lost access to federal employees working at county clinics and to grant specialists, forcing reliance on stop-gap funding. Add.304 n.22. Pending Forest Service cuts will shift wildfire response burden to counties. ECF 37-49 ¶¶2-4; ECF 37-58 ¶24; *see also* Add.304 n.23; ECF 37-19 ¶¶8, 22 (localities rely on emergency response to hazardous materials threatened by EPA cuts). These cuts directly threaten residents' health and safety and local governments' finances, which cannot be redressed through "back pay" to separated employees. *See Harris v. Bd. of Supervisors*, 366 F.3d 754, 762 (9th Cir. 2004) (it is "not speculative to anticipate that reducing the resources available will further impede the County's ability to deliver medical treatment to plaintiffs in their times of need"); Add.159-76, 191-93, 303-05, 572-75, 381-83, 609-14.

### D.     The District Court did not err in the scope of relief ordered

The scope of relief is "sized to fit the problems presented by th[is] case, no more and no less." Add.719. The District Court properly enjoined specified agencies from taking further steps to implement or enforce two EO subsections, the Memorandum, and ARRPs effectuating that EO. Add.719-20. As the court acknowledged, an injunction must be as broad as necessary to give parties relief, Add.719 (citing *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987)), including when "a showing of nationwide impact" is made, *California v. Azar*, 911 F.3d at 584. Plaintiffs submitted extensive evidence demonstrating harm to

///

///

-30-

Plaintiffs and their members across the country, tied to each enjoined agency.[35] *See supra* at 9-10, 29-30; ECF 37-3 to 37-59, ECF 96-1, ECF 101-3 to 101-10 (68 declarations from 27 Plaintiffs); Add.609-614 (declaration chart). Where "'a case involve[es] plaintiffs that operate and suffer harm in a number of jurisdictions ... the process of tailoring an injunction may be more complex.'" Add.719 (quoting *City & Cnty. of San Francisco v. Barr*, 965 F.3d 753, 766 (9th Cir. 2020)).

Defendants' contention that the District Court "made no effort" to tailor relief, Mot. 20, is plainly wrong. The court found it would be "impracticable and unworkable" to attempt to grant piecemeal relief enjoining Defendants' unlawful reorganization of entire agencies only to the extent it affects Plaintiffs, but not otherwise. Add.719. The Supreme Court has long recognized that injunctions may properly benefit nonparties when "necessary to redress the [harm to the] complaining parties." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 17 (2023) (affirming preliminary injunction of redistricting plan in challenge by Alabama citizens).

At the hearing, the District Court asked Defendants' counsel multiple times how it could issue an injunction limiting relief to the named plaintiffs: multiple times, the court received no answer, with Defendants conceding the undertaking

---

[35] Plaintiff unions and organizations collectively represent millions of members across the country and are not geographically limited. *See, e.g.*, Add.587 n.16 (citing AFGE, SEIU, APHA, and ARA declarations). Plaintiff cities' and counties' injuries derive not only or even mainly from termination of federal employees employed within their geographic boundaries. *Id.* (evidence from Harris County, San Francisco, King County, Santa Clara County, Chicago, and Baltimore).

would be difficult, while arguing it was "a compliance decision for the Government." Supp.Add.6:22-7:24, 8:11-17; *see also* Supp.Add.8:18-22 (District Court: "you haven't said how I could do it ... in the English language").[36]  Because Plaintiffs demonstrated nationwide and indivisible harms, *see* Add.157-76, 664-65, the injunction is well within the District Court's discretion.  *See also*, *e.g.*, ECF 37-27 ¶31 (showing interdependence of different positions at agency); ECF 37-31 ¶¶15-20 (similar).

Moreover, the APA's directive to "hold unlawful and set aside agency action" is not limited by "geographic boundaries."  *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 987 (9th Cir. 2020).  The "ordinary result" in APA cases "is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Regents of Univ. of Cal. v. Dep't Homeland Sec'y*, 908 F.3d 476, 511 (9th Cir. 2018), *vacated in part on other grounds*, 591 U.S. 1 (2020) (cleaned up); *accord Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 830-31 (2024) (Kavanaugh, J., concurring) ("[T]his Court has affirmed countless decisions that vacated agency actions ... rather than merely providing injunctive relief that enjoined enforcement of the rules against the specific plaintiffs.") (collecting cases).  And as in *Regents*, "the government fails to explain how the district court could have crafted a narrower injunction that would provide complete relief to the plaintiffs, including the entity plaintiffs."  908 F.3d at 512 (citation

---

[36] Injunctive relief limited to federal employee members of union Plaintiffs would not remedy other Plaintiffs' injuries.  Add.717.  And rescinding individual employees' RIF notices would do little good if ongoing implementation meant there is no office or functioning agency to which employees can return.

-32-

omitted); *see also* 5 U.S.C. §705 (court may postpone agency action's effective date and preserve status quo).

## II.    Defendants Do Not Establish Irreparable Injury

A stay applicant "must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citing *Nken*, 556 U.S. at 434). Without this threshold showing, "a stay may not issue." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). "The government cannot meet this burden by submitting conclusory factual assertions and speculative arguments that are unsupported in the record." *Id.* at 1059-60.

But that is precisely what Defendants submit here, asserting without evidence that "the injunction costs the government millions of dollars each week." Mot. 18-19. The District Court properly found that they failed to establish irreparable injury. Add.718-19. Defendants do not identify which employees "they would otherwise have let go in a reduction in force," Mot. 19, or show they are not providing important government services. And as the District Court explained, "the Constitution gives Congress the power—and responsibility—of the purse." Add.718. Congress exercised that power to appropriate the funds to employ these employees and maintain this level of government operations. As in *Community Legal Services in East Palo Alto v. U.S. Department of Health and Human Services*, 2025 WL 1393876, *6 (9th Cir. May 14, 2025), "[t]he Government has failed to demonstrate that spending congressionally appropriated funds as directed by Congress causes irreparable injury." *See also San Francisco*,

-33-

897 F.3d at 1232 ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress. Simply put, 'the President does not have unilateral authority to refuse to spend the funds.'") (quoting *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.)).

Unlike in *Maryland v. USDA*, 2025 WL 1073657, *1 (4th Cir. Apr. 9, 2025) (cited Mot. 19), this injunction requires no reinstatement of any employees. Moreover, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended … are not enough" to support a stay pending appeal. *Al Otro Lado*, 952 F.3d at 1008 (quoting *Sampson*, 415 U.S. at 90).

## III. Equitable Factors Weigh Against a Stay

The District Court appropriately rejected Defendants' balance-of-equities and public-interest arguments. Add.718-19; *see Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) ("assignment of weight to particular harms is a matter for district courts to decide"). After rejecting multiple opportunities to present evidence, Defendants now assert that the injunction costs them "millions of dollars each week" and complain that the injunction interferes with their efficiency and workforce-streamlining efforts. Mot. 18-19. But the District Court correctly found such justifications undermined by the record, including "the fact that defendants have placed many employees on paid administrative leave" while continuing to pay them; "admissions from agency heads that cuts have been or might be made too fast," requiring reinstatement of many terminated employees; and evidence that many cuts will not achieve cost savings. Add.718. "[J]ust

-34-

because a district court grants preliminary relief halting a policy advanced by one of the political branches does not in and of itself an emergency make." *Washington v. Trump*, 2025 WL 553485, at *1 (9th Cir. Feb. 19, 2025) (Forrest, J. concurring); *see also supra* at 33-34 (spending congressionally-appropriated funds is not irreparable injury); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) ("preventable human suffering" outweighs "financial concerns").

Finally, "[t]here is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).

## CONCLUSION

The Court should deny Defendants' motion.


DATED:  May 27, 2025          Respectfully submitted,

Stacey M. Leyton
Barbara J. Chisholm
Danielle E. Leonard
Corinne F. Johnson
Alice X. Wang
Robin S. Tholin
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Tel.: (415) 421-7151

By: */s/ Stacey M. Leyton*

-35-

*Attorneys for Plaintiff-Appellee Organizations*[37]

Elena Goldstein
Skye Perryman
Tsuki Hoshijima
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
Tel.: (202) 448-9090

By: */s/ Elena Goldstein*

*Attorneys for Plaintiff-Appellee Organizations*
*(except NRDC) and for City of Chicago, IL;*
*Martin Luther King, Jr. County, WA; Harris*
*County, TX; and City of Baltimore, MD*

Jules Torti
PROTECT DEMOCRACY PROJECT
82 Nassau St., #601
New York, NY 10038
Erica J. Newland
Jacek Pruski
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Ave., N.W., Suite 163
Washington, D.C. 20006
Tel.: (202) 579-4582
jules.torti@protectdemocracy.org

---

[37] Plaintiff-Appellee Organizations are the American Federation of Government Employees, AFL-CIO (AFGE); American Federation of State County and Municipal Employees, AFL-CIO; Service Employees International Union, AFL-CIO (SEIU); AFGE Local 1122; AFGE Local 1236; AFGE Local 2110; AFGE Local 3172; SEIU Local 521; SEIU Local 1000; SEIU Local 1021; Alliance of Retired Americans; American Geophysical Union; American Public Health Association; Center for Taxpayer Rights; Coalition to Protect America's National Parks; Common Defense Civic Engagement; Main Street Alliance; Natural Resources Defense Council, Inc. (NRDC); Northeast Organic Farming Association, Inc; VoteVets Action Fund Inc.; and Western Watersheds Project.

-36-

erica.newland@protectdemocracy.org
jacek.pruski@protectdemocracy.org

*Attorneys for Plaintiff-Appellee Organizations (except NRDC)*

Norman L. Eisen
Spencer W. Klein
STATE DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
Tel.: (202) 594-9958
Norman@statedemocracydefenders.org
Spencer@statedemocracydefenders.org

*Attorneys for Plaintiff-Appellee Organizations (except NRDC)*

Rushab Sanghvi
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO
80 F Street, NW
Washington, DC 20001
Tel.: (202) 639-6426
Sanghr@afge.org

*Attorney for Plaintiff-Appellee American Federation of Government Employees, AFL-CIO (AFGE) and AFGE locals*

Teague Paterson
Matthew Blumin
AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL-CIO
1625 L Street, N.W.
Washington, D.C.  20036
Tel.: (202) 775-5900
Tpaterson@afscme.org
Mblumin@afscme.org

-37-

*Attorneys for Plaintiff-Appellee American Federation of State County and Municipal Employees, AFL-CIO (AFSCME)*

Steven K. Ury
SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
Tel.: (202) 730-7428
steven.ury@seiu.org

*Attorney for Plaintiff-Appellee Service Employees International Union, AFL-CIO (SEIU)*

David Chiu
City Attorney
Yvonne R. Meré
Chief Deputy City Attorney
Mollie M. Lee
Chief of Strategic Advocacy
Sara J. Eisenberg
Chief of Complex and Affirmative Litigation
Molly J. Alarcon
Alexander J. Holtzman
Deputy City Attorneys
OFFICE OF THE CITY ATTORNEY FOR THE CITY AND COUNTY OF SAN FRANCISCO
1390 Market Street, 7th Floor
San Francisco, CA 94102
molly.alarcon@sfcityatty.org
alexander.holtzman@sfcityatty.org

By: */s/ Alexander Holtzman*

*Attorneys for Plaintiff-Appellee City and County of San Francisco*

Tony LoPresti

-38-

COUNTY COUNSEL
Kavita Narayan
Meredith A. Johnson
Raphael N. Rajendra
Hannah M. Godbey
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street, East Wing, 9th Floor
San José, CA 95110
Tel.: (408) 299-5900
Kavita.Narayan@cco.sccgov.org
Meredith.Johnson@cco.sccgov.org
Raphael.Rajendra@cco.sccgov.org
Hannah.Godbey@cco.sccgov.org

By: */s/ Tony LoPresti*

*Attorneys for Plaintiff-Appellee County of Santa Clara, Calif.*

David J. Hackett
General Counsel to King County Executive &
Special Deputy Prosecutor
Alison Holcomb
Deputy General Counsel to King County
Executive & Special Deputy Prosecutor
Erin King-Clancy
Senior Deputy Prosecuting Attorney
OFFICE OF KING COUNTY PROSECUTING
ATTORNEY LEESA MANION
401 5th Avenue, Suite 800
Seattle, WA 98104
Tel.: (206) 477-9483
David.Hackett@kingcounty.gov
aholcomb@kingcounty.gov
aclancy@kingcounty.gov

*Attorneys for Plaintiff-Appellee Martin Luther King, Jr. County (King County)*

-39-

Sharanya Mohan
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Tel.: (510) 738-6788
sai@publicrightsproject.org

*Attorney for Plaintiffs-Appellees Baltimore, MD; Chicago, IL; Harris County, TX; and King County, WA*

Christian D. Menefee
Harris County Attorney
Jonathan G.C. Fombonne
Deputy County Attorney and First Assistant
Tiffany Bingham
Managing Counsel
Sarah Utley
Division Director – Environmental Division
Bethany Dwyer
Deputy Division Director – Environmental Division
R. Chan Tysor
Senior Assistant County Attorney
Alexandra "Alex" Keiser
Assistant County Attorney
1019 Congress, 15th Floor
Houston, Texas 77002
Tel.: (713) 274-5102
Fax: (713) 437-4211
jonathan.fombonne@harriscountytx.gov
tiffany.bingham@harriscountytx.gov
sarah.utley@harriscountytx.gov
bethany.dwyer@harriscountytx.gov
chan.tysor@harriscountytx.gov
alex.keiser@harriscountytx.gov

*Attorneys for Plaintiff-Appellee Harris County, Texas*

-40-

Mary B. Richardson-Lowry,
Corporation Counsel of the City of Chicago
Stephen J. Kane
Rebecca A. Hirsch
Lucy Prather
City of Chicago Department of Law,
Affirmative Litigation Division
121 N. LaSalle Street, Suite 600
Chicago, Illinois 60602
Tel.: (312) 744-6934
Stephen.kane@cityofchicago.org
Rebecca.Hirsch2@cityofchicago.org
Lucy.Prather@cityofchicago.org

*Attorneys for Plaintiff-Appellee City of Chicago*

Ebony M. Thompson
Baltimore City Solicitor
Sara Gross
Chief of Affirmative Litigation
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, Maryland 21202
Tel.: (410) 396-3947
sara.gross@baltimorecity.gov

*Attorneys for Plaintiff-Appellee City of Baltimore*

-41-

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this response complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it is proportionally spaced and has a typeface of 14 points. It contains 9000 words and is filed with a motion for leave to exceed the word limit pursuant to Circuit Rule 32-2(a).  This response is a joint brief submitted by the separately represented parties of Plaintiff Organizations, the County of Santa Clara, and the City and County of San Francisco.

Dated: May 27, 2025                    */s/ Stacey M. Leyton*
                                        Stacey M. Leyton

## FILER'S ATTESTATION

Pursuant to Circuit Rule 25-5(f), the filer attests that all other signatories to this document concur in the content of, and have authorized, this filing.

Dated: May 27, 2025            _/s/ Stacey M. Leyton_____
                               Stacey M. Leyton